Commonwealth *v*. Clanton, Appellant.

522

Argued March 17, 1959. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and McBride, JJ.

*Edward E. Petrillo,* for appellant.

*Herbert J. Johnson, Jr.,* District Attorney, with him *Richard V. Scarpitti,* Assistant District Attorney, for appellee.

Opinion by Mr. Justice Bell, May 8, 1959:

Defendant was indicted and tried for murder. The jury found him guilty of murder in the first degree and fixed the penalty at life imprisonment. After defendant's motion for a new trial was dismissed, he appealed to this Court.

The jury could have found from the Commonwealth's evidence and from the reasonable and legitimate inferences therefrom that the Commonwealth proved beyond a reasonable doubt the following facts:

Jeff Clanton, the defendant, and his alleged wife, Robbie Mae, were separated. During the afternoon and early evening of August 24, 1957, Robbie Mae was with a group of friends, including the victim, Ernest Page. Page and Robbie Mae then went to her apart-

ment. Defendant spent much of the evening of August 24, 1957, searching for Robbie Mae. At about 1 o'clock on the morning of August 25, 1957, defendant went to Robbie Mae's apartment. Although Page was in the bedroom at that time, defendant stayed in the kitchen and did not discover Page, who was drunk and lying in his shorts across Robbie Mae's bed. Robbie Mae testified she slept on a couch in the living room. Defendant questioned her and stated that if he found them together he could "promise a good killing". Defendant then went home and loaded 8 bullets into an automatic pistol. After a restless sleep, he arose about 5 a.m., armed himself with his loaded pistol and walked nine blocks to Robbie Mae's apartment. He was a powerfully built man and was a former sparring partner of ex-heavyweight champion Ezzard Charles. He entered the apartment by breaking the door with his shoulder and found Robbie Mae in the living room. Immediately upon his entrance he cocked his pistol. At gun point he forced Robbie Mae into the bedroom where he saw Page on the bed dressed only in his shorts. Putting the gun to Page's face, defendant dragged Page by the neck onto the floor of the living room where a scuffle ensued. During the scuffle the gun was discharged and defendant shot himself in the finger. When Robbie Mae tried to dissuade defendant from his obvious purpose, defendant turned upon her and shot her through the shoulder, knocking her to the floor. Page regained his feet and ran toward the only door of exit from the apartment. Defendant fired two shots at Page. The first shot missed but the second hit Page in the center of his back, knocking him to the floor, face downward. As Page tried to rise from the floor of the room defendant stood directly over him and shot him again, this time in the chest. Defendant then turned to Robbie Mae, who was prone on the living room floor (from

the bullet wound in her shoulder) but who was still pleading with defendant to stop shooting, and shot her again, this time in the lung. Robbie Mae recovered from the shooting, but Page died from his wounds within a few hours.

Defendant's first contention is that the evidence does not sustain a first degree verdict. This is clearly and utterly devoid of merit: *Commonwealth v. Ballem,* 386 Pa. 20, 123 A. 2d 728; *Commonwealth v. Homeyer,* 373 Pa. 150, 94 A. 2d 743; *Commonwealth ex rel. Lagana v. Day,* 385 Pa. 338, 123 A. 172; *Commonwealth v. Iacobino,* 319 Pa. 65, 178 A. 823; *Commonwealth v. Troup,* 302 Pa. 246, 153 A. 337; *Commonwealth v. Green,* 294 Pa. 573, 144 A. 743; *Commonwealth v. Jones,* 355 Pa. 522, 50 A. 2d 317; *Commonwealth v. Heller,* 369 Pa. 457, 87 A. 2d 287; *Commonwealth v. Kelly,* 333 Pa. 280, 4 A. 2d 805.

Defendant next urges that the Court erred in permitting two enlarged pictures of the body of the deceased to be placed in front of the jury throughout the trial. The trial Judge properly cautioned the jury as to the purpose of the photographs. Even if one of the two photographs could be considered to be gruesome, they were admissible because they were absolutely essential to the Commonwealth's case, especially in view of defendant's contention that he shot Page in self-defense.

In *Commonwealth v. Ballem,* 386 Pa., supra, the Court held that it was not reversible error to exhibit to the jury on a screen a magnified picture of a severed human hand, which clearly showed a scar on the burned right hand of the victim severed above the wrist joint. Dopirak had such a scar on his wrist. The Court said (pages 26-27) : "It was properly admitted in evidence in order to aid in identifying the victim as John Dopirak and to explain or illustrate the testimony of

medical or identifying witnesses. Pistols, fruits of the crime, clothing, parts of the body of the person killed, everything pertaining to the crime which will aid the jury in its consideration of the (alleged) crime and the guilt or innocence of the accused, is admissible. The admission or exclusion of these objects and particularly of photographs is a matter which is within the sound discretion of the trial Judge, and the fact that a picture is gruesome is not sufficient to exclude it: Commonwealth v. Capps, 382 Pa. 72, 114 A. 2d 338; Commonwealth v. Bibalo, 375 Pa. 257, 100 A. 2d 45; Commonwealth v. Smith, 374 Pa. 220, 97 A. 2d 25; Commonwealth v. Simmons, 361 Pa. 391, 65 A. 2d 353; Commonwealth v. Wentzel, 360 Pa. 137, 61 A. 2d 309; Commonwealth v. Ferry, 326 Pa. 129, 191 A. 130."

The photographs were used in the instant case to indicate the kind and location of the wounds and/or the position of the victim's body and its location in the apartment. Under these facts, it is manifest that the photographs were properly admitted.

Defendant next complains of the charge of the Court and particularly of the refusal of the trial Judge to instruct the jury in accordance with defendant's points for charge in connection with the effect of passion and self-defense. The Court's charge must be considered as a whole, and not just isolated excerpts therefrom: *Commonwealth v. Richardson*, 392 Pa. 528, 546, 140 A. 2d 828; *Commonwealth v. Donough*, 377 Pa. 46, 53, 103 A. 2d 694; *Commonwealth v. Patskin*, 372 Pa. 402, 93 A. 2d 704; *Commonwealth v. Barnak*, 357 Pa. 391, 54 A. 2d 865; *Commonwealth v. Schurtz*, 337 Pa. 405, 411, 10 A. 2d 378; *Commonwealth v. Moyer*, 357 Pa. 181, 187, 53 A. 2d 736; *Commonwealth v. Glenn*, 321 Pa. 241, 183 A. 763; *Commonwealth v. Holley*, 358 Pa. 296, 56 A. 2d 546; *Commonwealth v. Cargill*, 357 Pa.

510, 55 A. 2d 373; *Commonwealth v. Almeida*, 362 Pa. 596, 600, 68 A. 2d 595; *Commonwealth v. Becker*, 326 Pa. 105, 191 A. 351; *Commonwealth v. Stelma*, 327 Pa. 317, 192 A. 906. The charge, considered as a whole was accurate and fair and contained no reversible error.

Defendant contends it was reversible error to refuse a point for charge relating to passion, and a point relating to self-defense. There is no merit in this contention. The point relating to passion was properly refused because it contained an inaccurate statement of the law. The point relating to self-defense was properly refused because the Court (a) had clearly and accurately covered the subject in its charge to the jury, and (b) had already affirmed several of defendant's points for charge on the subject of self-defense, which points included the point in controversy.

Defendant also urges that the Court below erred in not granting a new trial on the ground of after-discovered evidence. The law in regard to after-discovered evidence is well settled. In *Commonwealth v. Green*, 358 Pa. 192, 56 A. 2d 95, the Court said (page 199) : " 'It is incumbent upon the party who moves for a new trial on the ground of newly discovered evidence to satisfy the court that the newly discovered evidence is such as could not with reasonable diligence have been discovered and produced at the trial; that it is not merely cumulative and that it is such as to render a different result probable on the retrial of the case. Commonwealth v. Russella et al., 117 Pa. Superior Ct. 359, 366; Commonwealth v. Brady, 76 Pa. Superior Ct. 488.' "

The records tendered as after-discovered evidence indicate that Clanton is emotionally unstable, but "is mentally responsible both to distinguish right from wrong and to adhere to the right." This was not admis-

sible under the above mentioned rule, as after-discovered evidence. Moreover, since the jury fixed the penalty at life imprisonment, it could not have resulted—if admitted—in further mitigation of sentence.

Defendant's last contention is that it was error for the Court to allow his wife, known as Robbie Mae Clanton, to testify against him because such testimony is prohibited by §2(b) of the Act of May 23, 1887.* That Act pertinently provides: "Nor shall husband and wife be competent or permitted to testify against each other, . . . except that in . . . any criminal proceeding against either for bodily injury or violence attempted, done or threatened upon the other, . . . each shall be a competent witness against the other, . . ." The Act was intended to make competency the rule and incompetency the exception, and a narrow construction of the Act would often result in suppressing truth.** Nevertheless, the language of the Act cannot be ignored in pursuit of its spirit even though a broad or liberal construction would obviously protect society in criminal cases where a wife is an eye witness to a murder com-

—————

* P. L. 158, 19 PS §683.

** In *Hawkins v. United States*, 384 U. S. 74, (decided November 24, 1958), the Court held that a wife could not testify against her husband who was charged with a violation of the Mann Act, although she could testify against him "where the husband commits an offense against the person of his wife." Mr. Justice STEWART, in a concurring opinion, aptly said: "The rule of evidence we are here asked to re-examine has been called a 'sentimental relic'. It was born of two concepts long since rejected: that a criminal defendant was incompetent to testify in his own case, and that in law husband and wife were one. . . . Any rule that impedes the discovery of truth in a court of law impedes as well the doing of justice. When such a rule is the product of a conceptualism long ago discarded, is universally criticized by scholars, and has been qualified or abandoned in many jurisdictions, it should receive the most careful scrutiny."

mitted by her husband. Especially would this admissibility seem wise, if legally permitted, where the shooting of the victim and of defendant's wife alleged is, as here, so interwoven as to be actually one event. Cf. *Commonwealth v. Spink,* 137 Pa. 255, 20 A. 680. However, it is not necessary to determine the competency or incompetency of Robbie Mae under this statute.

Defendant and Robbie Mae were married on November 9, 1952, she under her maiden name of Ruby Mitchell. The uncontradicted record shows that at the time of this marriage she was already lawfully married on April 3, 1948 to a man named Richard Leroy Smith; and the uncontradicted evidence shows that she had never been divorced from Smith, and that Smith is still alive. The Court below therefore correctly decided that she was a competent witness: *Commonwealth v. March,* 248 Pa. 434, 94 A. 142. The test is not whether the parties to an allegedly lawful marriage believe they are lawfully married; the test is whether *in law* they are lawfully married: *Commonwealth v. Mudgett,* 174 Pa. 211, 254, 34 A. 588; *Commonwealth v. Carey,* 105 Pa. Superior Ct. 362, 364, 365, 161 A. 410; *Commonwealth v. Gray,* 72 Pa. Superior Ct. 279. See also: *Commonwealth v. March,* 248 Pa., supra. Furthermore, the burden is on defendant to prove incompetency: Cases supra. Robbie Mae was a competent witness.

Judgment and Sentence affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

One of the most difficult tasks of a presiding trial judge is to hold the proceedings within the channels of relevancy and to exclude all matters which might improperly affect the jury's deliberations. Particularly is this true in a murder trial and particularly is it

true that the judge in such a case should exercise unceasing vigilance to keep out all untoward influences.

In the case at bar the defendant Jeff Clanton was accused of having murdered a man called Ernest Page. It was unequivocally and conclusively established that he killed Page by firing revolver shots into his body. An eyewitness testified to seeing Clanton's revolver accomplishing the fatal deed. The defendant himself admitted firing the mortal shots. The corpus delicti was proved beyond question.

There was thus no necessity whatsoever of introducing photographs of the dead body. Nevertheless the Commonwealth exhibited to the jury two gruesome pictures of the corpse. The defendant objected on the ground that their introduction would inflame the jury against him. His objection was overruled and, on being convicted, he assigned this ruling of the Trial Court as a reason for a new trial. It is a reason which has merit.

I believe that the time has arrived for this Court to declare that the exhibition of gruesome and repellent photographs, when they are not a necessary link in the chain of evidence against the accused, will constitute a trial error of sufficient gravity to require a retrial of the case. This case would have been an excellent vehicle for the promulgation of such a policy because the manner in which the objectionable photographs were displayed in the courtroom was especially reprehensible. Enlarged to poster size they were attached to a billboard next to the jury and there they remained *throughout the trial*, unremittingly searing the eyes of the jurors with their horrible, provocative, and grisly appeal.

Even if it were to be assumed that the photographs served some purpose in letting the jurors look upon the image of the blood-bespattered, near-nude body of

the victim, why was it necessary to flaunt the gory image before them every minute of the trial? What purpose could such an exhibit have except that of whipping up the resentment of the jury against the man charged with the anatomical mutilation they were never allowed to forget? The issue in the trial was not: Who killed Page?—Everyone knew it was the defendant Clanton. The issue was: Did Clanton have any justification in taking the life of Page? Clanton said he shot in self-defense. He explained why he thought he was justified in firing at Page. The eyewitness Robbie Mae related what she saw. What could be added to this definitive testimony by the unceasing projection of the photographs of the dead body? They could only produce an ever-increasing animosity against the perpetrator of the mortal act, whether he was justified or not.

The Majority Opinion says: "The photographs were used in the instant case to indicate the kind and location of the wounds and/or the position of the victim's body and its location in the apartment." Accepting this as a reasonable conclusion, the Majority Opinion still offers no explanation why, after the jury had seen the location of the wounds and/or the position of the victim's body and its location in the apartment, it became necessary to keep showing the jury the victim's wounds for days. Even Marc Antony did not expose Julius Caesar's wounds to the populace of Rome *that* long.

A murder trial is by its very nature dramatic, and sometimes it approaches theatrical projection, but the judge should prevent its being converted into a circus performance. The garish display in this trial of the enlarged pictures of a corpse, like lurid posters advertising a tawdry motion picture in a cheap movie house, could not help but detract from the dignity and im-

partiality of the court proceedings and, to that extent, the defendant was deprived of a fair trial.

The tendency today in fields of entertainment and other media of expression toward what is sordid, macabre, and ugly is appalling. It is to be hoped that this flood of unwholesome sensationalism may be stopped at the courthouse door when the issues involved do not require emphasis upon what, by its intrinsic character, is revolting or excessively disturbing to the normal sensibilities of normal mankind.

The whole legal world stood aghast at the murder trial conducted in the sports arena in Havana last year before 18,000 wild-eyed spectators crying for the blood of the defendant. While we would never allow our trials to degenerate into such a weird and savage spectacle, we should ever be alert to protect the jury from all outside forces, whether those forces be a shouting mob or screaming posters.